**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COOS COUNTY BOARD OF COUNTY
COMMISSIONERS,
                    *Plaintiff-Appellant,*

                    v.

DIRK KEMPTHORNE,* in his official
capacity as Secretary of the
Interior; UNITED STATES FISH &
WILDLIFE SERVICE; H. DALE HALL,
in his official capacity as Director,
United States Fish and Wildlife
Services,
                    *Defendants-Appellees.*

No. 06-35634

D.C. No.
CV-06-06010-MRH

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Argued and Submitted
March 5, 2008—Portland, Oregon

Filed June 26, 2008

Before: Ferdinand F. Fernandez and Marsha S. Berzon,
Circuit Judges, and Otis D. Wright II,** District Judge.

Opinion by Judge Berzon

---

*Dirk Kempthorne is substituted for his predecessor, Gale A. Norton, as Secretary of the Interior. Fed. R. App. P. 43(c)(2).

**The Honorable Otis D. Wright II, United States District Judge for the Central District of California, sitting by designation.

7469

**COUNSEL**

Ralph Kasarda (argued), J. David Breemer, M. Reed Hopper, and Scott Andrew Shepard, of the Pacific Legal Foundation,

for plaintiff-appellant Coos County Board of County Commissioners.

Ellen J. Durkee (argued), Courtney Taylor, and Lisa Jones, Environment & Natural Resources Division, U.S. Department of Justice, Sue Ellen Wooldridge, Assistant Attorney General, and Benjamin C. Jessup and Eric Nagle, Office of the Solicitor, U.S. Department of the Interior, for defendants-appellees Dirk Kempthorne, Secretary of the Interior, United States Fish and Wildlife Service, and H. Dale Hall, Director, United States Fish and Wildlife Service.

## OPINION

BERZON, Circuit Judge:

We are asked to decide whether the Fish and Wildlife Service ("FWS")[1] has an enforceable duty promptly to withdraw a threatened species from the protections of the Endangered Species Act (the "ESA" or the "Act"), 16 U.S.C. §§ 1531-1544, after a five-year agency review mandated by the Act found that the species does not fit into one of the several types of population categories protected under the ESA. We answer that FWS does not have such a duty.

## I.   BACKGROUND

The Coos County Board of County Commissioners ("Coos County") brought this action under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559. The suit rests on the results of a FWS species status review of the marbled murrelet, a rare seabird that nests in mature and old-growth forests. *See generally* U.S. Fish & Wildlife Service, Marbled

---

[1]The Secretary of the Interior and the Director of FWS are also defendants in this case. We refer to all of the defendants collectively as FWS.

Murrelet 5-Year Review ("Five Year Review"). The murrelets living in Washington, Oregon, and California — which we will refer to as the tri-state murrelets — are the protected population. The tri-state murrelets — and only the tri-state murrelets — were listed under the ESA as a "threatened species," after the detailed consideration required by the statute. *See* Determination of Threatened Status for the Washington, Oregon, and California Population of the Marbled Murrelet, 57 Fed. Reg. 45,328, 45,328-29 (Oct. 1, 1992) ("Listing Rule").

FWS is required to "conduct, at least once every five years, a review of all species" protected under the ESA and to "determine on the basis of such review whether" the listing status of protected species should be changed. 16 U.S.C. § 1533(c)(2). The five-year review of the tri-state murrelet listing, released in 2004, concluded that the tri-state murrelets do not meet the definition of a "distinct population segment," one of the population categories which may be protected under the ESA, *see* 16 U.S.C. § 1532(16), but determined that they nonetheless remained threatened. Five-Year Review at 6, 28. FWS also noted that a district court had held that the tri-state murrelets could be protected even if they did not constitute a distinct population segment, because they occupied a significant portion of the range of the entire species. *Id.* at 6. FWS therefore determined not to alter the protections afforded the species pending a more complete review. *Id.* at 28.

Coos County maintains that this cautious approach to species protection is illegal, and that, instead, FWS had a mandatory duty promptly to remove the tri-state murrelets from the ESA's threatened species list, "delisting" the birds, as a result of the Five-Year Review. Seizing on a statutory deadline for "promptly publish[ing]" proposed regulations in response to a citizen petition so warranting, Coos County argues that FWS had such a duty here and must follow the same deadline, even though no petition has been filed. To explain why Coos County is mistaken, and why the dismissal of its suit was

appropriate, we first set out the biological and legal history of the tri-state murrelet listing and of the subsequent litigation.

## A.   The Marbled Murrelet

In 1988, the National Audubon Society petitioned FWS to list the California, Oregon, and Washington population of the marbled murrelet as a threatened species. *See* Proposed Threatened Status for the Marbled Murrelet in Washington, Oregon and California, 56 Fed. Reg. 28,362, 28,364 (June 20, 1991) ("Proposed Rule").[2] A "threatened" species is one which "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The Audubon Society alleged that the marbled murrelet population in the three states was dangerously depleted.

Murrelets — small, dove-sized birds — feed primarily on sea life and nest in coastal mature and old-growth forests. *See* Listing Rule, 57 Fed. Reg. at 45,328-29. "[T]he main cause of population decline has been the loss of older forest and associated nest sites," in large part because of timber harvesting. *Id.* at 45,330. At the time the tri-state murrelets were listed for ESA protection, over 80% of their habitat had been lost in Washington and Oregon and as much as 96% had been lost in California. *Id.* at 45,333. Murrelet nests in the remaining fragments of old growth forest are more accessible to predators than they were before the forests were lost, further threatening the species. *Id.* at 45,334. Also, when murrelets leave the forest to feed at sea, they are threatened by gill-net fishing boats and by oil spills. *Id.* at 45,335. Because murrelets do not reproduce every year and generally lay only one egg when they do, the species recovers slowly from population losses. *Id.* at 45,336.

---

[2]Technically, the Secretary of the Interior has authority over the tri-state murrelets, *see* 16 U.S.C. § 1532(15), but that authority has been delegated to FWS, *see* 50 C.F.R. § 402.01(b). Thus, references to the Secretary in this opinion refer interchangeably to FWS, unless otherwise noted.

As a result of these various forces, murrelet populations crashed. Historically, as many as 60,000 murrelets may have lived in California alone. *Id.* at 45,329. By 1992, when the tri-state murrelets were listed as threatened, FWS believed that only 9,000 birds all together then remained in all three states. *Id.* at 45,329. Some years after listing, FWS estimated the annual rate of population decline in the three states as between four and six percent. *See* Final Designation of Critical Habitat for the Marbled Murrelet, 61 Fed. Reg. 26,256, 26,259 (May 24, 1996) ("Critical Habitat Rule"). These population losses are important, as the three states comprise roughly one-third of the murrelet's range, which extends north to Alaska. *See* Proposed Rule, 56 Fed. Reg. at 28,364, 28,366. The Proposed Rule concluded that "California, Oregon, and Washington constitute a significant portion of the marbled murrelet's range." *Id.* at 28,366.

## B.   Legal Protections for the Marbled Murrelet

FWS moved slowly in considering the Audubon Society's petition to list the tri-state murrelets. Eventually, the Audubon Society sued, contending that FWS had missed mandatory ESA deadlines triggered by a listing petition. *See Marbled Murrelet v. Lujan*, No. C91-522R, 4-7 (D. Wash. Sept. 17, 1992).

At issue in that case was whether there was a "substantial disagreement," *see* 16 U.S.C. § 1533(b)(6)(B)(i), concerning whether the tri-state population of the marbled murrelet was a "distinct population segment" of the larger species. The ESA defines species to "include[ ] . . . any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16) (emphasis added). FWS maintained that the tri-state murrelets could be listed only as a distinct population segment, and that there was a substantial scientific disagreement as to that question, justifying a six-month delay. Notice of Extension of the Final Decision to List the Washington, Oregon, and California Pop-

ulation of the Marbled Murrelet as a Threatened Species, 57 Fed. Reg. 33,478, 33,479 (July 29, 1992) ("Extension Notice"); *see* 16 U.S.C. § 1533(b)(6)(B)(i) (providing for such a delay for the purpose of "soliciting additional data").

The district court in *Marbled Murrelet* disagreed with both FWS's premises and its conclusion. It first held that FWS could list the tri-state population whether or not that population was a distinct population segment, rendering any substantial disagreement as to that question irrelevant. *Marbled Murrelet*, No. C91-522R at 11-12. The court observed that a threatened species is one which "is likely to become an endangered species within the foreseeable future throughout all *or a significant portion of its range*." *Id.* at 11 (quoting 16 U.S.C. § 1532(20), emphasis added). In light of this definition, the court reasoned as follows:

> Plaintiffs argue that, in order to support listing the marbled murrelet as threatened under the ESA, the Secretary [of the Interior] need only find that the North American subspecies of the marbled murrelet is threatened throughout a significant portion of its range. Plaintiffs then point out that the Secretary reached those very conclusions in his [Proposed Rule] and that he has never retreated from or retracted them.
>
> Indeed, the [Proposed Rule] cites the definition of a "threatened species" quoted above and then states that "California, Oregon, and Washington constitute a significant portion of the marbled murrelet's range. In those states the species is immediately threatened by the loss of nesting habitat (old-growth and mature forests)." [Citation omitted] Nothing in the [Extension Notice] contradicts or casts any doubt on these conclusions. Therefore, the court concludes that, based on the uncontradicted findings that the marbled murrelet qualifies for listing as a threatened spe-

cies throughout a significant portion of its range within the meaning of the ESA, there is no need to consider the alternative basis of whether the tri-state population is a distinct population segment which might qualify for protection under the ESA.

*Marbled Murrelet*, No. C91-522R at 11-12.[3] The court further held that, in any event, there was no substantial disagreement as to the distinct population segment question, so no delay was justified even if the distinct population segment issue mattered. *Id.* at 12-22. It ordered FWS promptly to make its final listing decision. *Id.* at 22-25. FWS complied with the district court's order a few days later, and did not appeal it.

In its final listing rule, FWS discussed in an interwoven fashion whether the tri-state murrelets are a distinct population segment and whether they inhabit a significant portion of the species's range. The rule provides, in a section entitled "Distinct Population Segment":

> [E]xisting legal mechanisms are not adequate to protect the marbled murrelet in California, Oregon, and Washington. The three states encompass roughly one-third of the geographic area occupied by this subspecies, comprising a significant portion of its range. The amount of nesting habitat has undergone

_____

[3]The district court referred to the North American marbled murrelet as a "subspecies" because, at the time of listing, that population was thought to be within the same species as an Asian murrelet species. *See* Listing Rule, 57 Fed. Reg. at 45,328. After reviewing more recent studies, FWS concluded that the North American murrelet is a distinct species. *See* Designation of Critical Habitat for the Marbled Murrelet; Proposed Rule, 71 Fed. Reg. 53,838, 53,840 (Sept. 12, 2006). The distinction is not of any relevance to the ESA's protections, as the statute specifies that "[t]he term 'species' includes any subspecies of fish or wildlife," 16 U.S.C. § 1532(16), and FWS has construed the statute to allow it to protect distinct population segments of subspecies. *See* Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4,722, 4,724 (Feb. 7, 1996).

a tremendous decline since the late 1800s (most of which has taken place during the last 20 to 30 years), especially in the coastal areas of all three states.

At the time of proposing to list the marbled murrelet in Washington, Oregon, and California, the Service considered the murrelets in these States to constitute a distinct population segment comprising a significant portion of the eastern Pacific subspecies of the marbled murrelet. While the Service continues to believe that existing legal protection is not adequate to ensure survival of murrelets in the three-state area, some question remains whether the population listed in this rule qualifies for protection under the [ESA's] definition of "species."

Compliance with a court order required a final decision on listing to be made at this time. Based on the information now available to the Service, the only supportable decision that can be reached within the limit imposed by the court is to list the population as proposed. Nevertheless, the Service intends to reexamine the basis of recognizing this population of murrelets as a "species" under the Act. Within 90 days, the Service will announce the results of this examination and at that time may propose a regulatory change that would alter the listing of the murrelet as a threatened species.

Listing Rule, 57 Fed. Reg. at 45,330.

Despite its equivocation in the Listing Rule, FWS never proposed altering the listing. In 1996, FWS designated critical habitat for the murrelets, *see* 16 U.S.C. § 1533(a)(3), observing that the "loss of nesting habitat [is] one of the primary factors limiting current population size from British Columbia to California." Critical Habitat Rule, 61 Fed. Reg. at 26,258.

In 1997, FWS adopted a Recovery Plan for the murrelets. *See* U.S. Fish & Wildlife Service, Recovery Plan for the Marbled Murrelet ("Recovery Plan");[4] *see also* 16 U.S.C. § 1533(f). Recovery plans set out, among other goals, "objective, measurable criteria which, when met, would result in a determination . . . that [a] species be removed from the list." 16 U.S.C. § 1533(f)(B)(ii). The Recovery Plan did not develop final specific delisting criteria, pending further research, but did provide "[i]nterim delisting criteria," which include:

> 1) Trends in estimated population size, densities and productivity have been stable or increasing in four of the six zones [into which the region occupied by the tri-state murrelets has been divided] over a 10-year period. This period of time will encompass at least one to two El Niño events, based on recent frequency of occurrences.

> 2) Management commitments (marine and terrestrial) and monitoring have been implemented that provide adequate protection of marbled murrelets in the six Conservation Zones for at least the near future (50 years).

Recovery Plan at 112-13; *see also* Five-Year Review at 17.

Since 1992, when the tri-state murrelets were listed, their population appears to have somewhat increased, although improvements in data collection in the interim makes absolute population comparisons difficult. *See id.* at 6-7. The 2004 Five-Year Review estimated that as many as 24,400 birds may now be present in the three states. *Id.* at 18. Nonetheless, the Five-Year Review also found that the murrelet continues to face serious threats and, while there is not adequate infor-

---

[4]The Recovery Plan is available online at http://ecos.fws.gov/docs/recovery_plans/1997/970924.pdf.

mation presently to determine a population trend, many experts suspect the population is now declining. *Id.* at 6-7, 18-20. The population north of the border also appears to be in trouble, as Canada recently listed the marbled murrelet as a threatened species under its Species at Risk Act ("SARA"), S.C. ch. 29, enacted in 2002. *See* Five-Year Review at 14-16.

## C.   The Distinct Population Segment Policy and the Five-Year Review

After the tri-state murrelets were listed as threatened, and before the Five-Year Review, FWS promulgated a policy defining characteristics of "distinct population segments" for purposes of the ESA. *See* Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4,722, 4,724 (Feb. 7, 1996) ("DPS Policy"); *see also* 16 U.S.C. § 1532(16). We recently determined that the DPS Policy is "based on a reasonable construction" of the ESA. *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1143-45 (9th Cir. 2007).

In the DPS Policy, FWS set out a two-step process for determining whether a population qualifies as a "distinct population segment." DPS Policy, 61 Fed. Reg. at 4,725; *see also Nw. Ecosystem Alliance*, 475 F.3d at 1138 (describing the DPS Policy). FWS first asks if the population is "discrete" with regard to "the remainder of the species to which it belongs," and, if the population is discrete, then inquires into the "significance" of the population to the species as a whole. *Id.* The DPS Policy does not equate the "significant portion of the range" and "distinct population segment" issues, although range considerations are incorporated into the significance aspect of the inquiry. *Id.*[5]

---

[5]A population may, for instance, be significant if its loss "would result in a significant gap in the range of a taxon," or if it is "the only surviving natural occurrence of a taxon" outside of its historic range. DPS Policy, 61 Fed. Reg. at 4,725.

Of particular relevance here, under the DPS Policy a species may be discrete even if it is not separated from other members of its species by physical or ecological barriers, if "[i]t is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of [16 U.S.C. § 1533(a)(1)(D), which addresses "the inadequacy of existing regulatory mechanisms" to protect a species]." DPS Policy, 61 Fed. Reg. at 4,725. FWS "recognize[d] that the use of international boundaries as a measure of discreteness may introduce an artificial and non-biological element to the recognition" of distinct population segments, but maintained that "national legislation, which has its principal effects on a national scale, [could properly] recognize units delimited by international boundaries." *Id.* at 4,723.

FWS understood that earlier distinct population segment determinations might not satisfy the DPS Policy, and so announced that "[a]ny [distinct population segment] of a vertebrate taxon that was listed prior to implementation of this policy will be reevaluated on a case-by-case basis as recommendations are made to change the listing status for that distinct population segment." *Id.* at 4,725. The policy is also to "be considered in the 5-year reviews of the status of listed species required by [16 U.S.C. § 1533(c)(2)]." *Id.* The tri-state murrelet distinct population segment determination was thus subject to consideration under the new DPS Policy when it came up for a five-year review.

The ESA provides for such reviews in 16 U.S.C. § 1533(c), which is entitled "Lists" and addresses generally FWS's obli-

Taxonomy is "the science dealing with the description, identification, naming, and classification of organisms;" a taxon is a taxonomic category, such as a genus or species. The Random House Dictionary of the English Language 1947 (2nd ed. 1987).

gation to maintain and update the endangered and threatened species lists. The five-year review provision, 16 U.S.C. § 1533(c)(2), states:

The Secretary shall —

(A) conduct, at least once every five years, a review of all species included [in the endangered and threatened species lists provided for in 16 U.S.C. § 1533(c)(1)]; and

(B) determine on the basis of such review whether any such species should —

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b) of [16 U.S.C. § 1533].

The murrelet review was delayed for several years. In 2002, a timber industry group, the American Forest Resource Council, along with several lumber companies, filed suit arguing that FWS had failed to comply with a mandatory duty, imposed by 16 U.S.C. § 1533(c)(2), to review the tri-state murrelet listing. The suit settled, with FWS agreeing to complete the review. *See* Settlement Agreement and Stipulation of Dismissal with Prejudice, *Am. Forest Res. Council v. Sec'y of the Interior*, Civ. No. 02-06087-AA (D. Or., Jan. 2003). As a result, FWS published an announcement in the Federal Register, as it is required to do when it initiates a review. *See* 5-Year Review of the Marbled Murrelet and the Northern Spot-

ted Owl, 68 Fed. Reg. 19,569 (Apr. 21, 2003) ("Review Notice"); *see also* 50 C.F.R. § 424.21 (requiring a published review announcement). In the Review Notice, FWS explained that the review would assess:

> (a) Whether new information suggests that the species' population is increasing, declining, or stable; (b) whether existing threats are increasing, the same, reduced, or eliminated; (c) if there are any new threats; and (d) if new information or analysis calls into question any of the conclusions in the original listing determination as to the species' status. The review will also apply this new information to consideration of the appropriate application of the [DPS Policy] to the listed entity, if applicable.

68 Fed. Reg. at 19,570. The notice invited the public to submit relevant information. *Id.* at 19,569, 19,571. FWS explained that "[i]f the present classification of [the murrelet] is not consistent with the best scientific and commercial information available, we may, at the conclusion of this review, initiate a separate action to propose changes to the List accordingly." *Id.*

The Five-Year Review was conducted by "over a dozen biologists," along with "an international environmental consulting company." Five-Year Review at 1. Once these experts had gathered relevant information, FWS managers convened to answer three questions:

> 1) Does the currently listed distinct population segment meet the criteria established in the Service's [DPS Policy]?
>
> 2) Is there new information about the threats or population status of [sic] the murrelet?
>
> 3) If so, does the new information suggest that a change in listing status is warranted?

*Id.* at 2.

In accord with this outline, the Five-Year Review first ana-
lyzed whether the tri-state murrelets qualified as a distinct
population segment under the DPS Policy. *Id.* at 6, 14-17.
FWS found that, as of 2002 when Canada protected its murre-
let population under SARA, there were no significant differ-
ences at the American/Canadian border in legal protections
for the species. *Id.* at 14-17. As the American and Canadian
murrelet populations are not otherwise separate, FWS found
that they did not meet the DPS Policy's discreteness criterion,
and so could not properly be termed a distinct population seg-
ment. *Id.* at 6, 14-17. FWS noted, however, that the district
court in *Marbled Murrelet* "found that, as the murrelet quali-
fies for listing as a threatened species throughout a significant
portion of its range, 'there is no need to consider the alterna-
tive basis of whether the tri-state population is a distinct popu-
lation segment.' " *Id.* at 6 (quoting *Marbled Murrelet*, No.
C91-522R at 12).

The Review went on to find that the tri-state murrelets are
still threatened and that none of the interim delisting criteria
from the Recovery Plan have been met. Five-Year Review at
17-18. Further, the new information FWS collected

> supports the conclusion that the past harvest of old-
> growth forests in the Washington, Oregon, and Cali-
> fornia range of the murrelet has significantly contrib-
> uted to a commensurate decline in the number of
> murrelets [from historic numbers]. There is no com-
> pelling information indicating this situation has
> improved through the production of significant new
> suitable nesting habitat since listing.

Five-Year Review at 18-19 (internal citation omitted).

Accordingly, the Review concluded, a change in ESA clas-
sification was not warranted because "[t]he threat situation

has not changed such that the murrelet DPS [(distinct population segment)] is no longer likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."[6] Five-Year Review at 21. FWS did opt to "complet[e] . . . a range-wide status review,"after which it might take further action regarding the tri-state murrelet listing. Five-Year Review at 28. Pending completion of that larger review, "[t]here will be no change in the species status." *Id.*

## D. The Litigation

With the Five-Year Review in hand, Coos County wrote FWS and advised of its intent to sue to force the delisting of the tri-state murrelets. *See* 16 U.S.C. § 1540(g)(2) (providing notice requirements for ESA citizen suits). Coos County contended that the Five-Year Review's determination that the tri-state population did not fulfill the DPS Policy meant that FWS had a duty promptly to publish a proposed rule delisting the murrelets, and, moreover, to publish a final rule implementing the delisting within a year of the proposed rule. Overlooking the Review's conclusion that the tri-state murrelets had not met the recovery criteria and remained threatened as well as the Review's reference to the *Marbled Murrelet* court's "significant portion of the range" holding, Coos County charged that FWS's determination to continue protecting the murrelets, at least pending the completion of a fuller review, had been made "[w]ithout explanation or claim of authority."

When FWS did not comply with Coos County's requests,

---

[6]The Review referred to the tri-state murrelet population as a distinct population segment, even though it also explained that the population did not meet the DPS Policy. It seems apparent that FWS was referring to the tri-state murrelets as a group, not to their technical status. At oral argument, government counsel so indicated, suggesting that the use of "DPS" as shorthand for the tri-state murrelets was due to sloppy editing.

Coos County filed suit. In its first cause of action, it argued that FWS had violated the ESA; in the second, it charged FWS had violated the APA. The ESA provisions which Coos County argued were violated are:

- 16 U.S.C. § 1533(c)(2), which requires FWS to conduct a five-year review and to make a determination based upon it;

- 16 U.S.C. § 1533(b)(3)(B)(ii), which requires FWS to "promptly publish" a proposed rule within twelve months after receiving a petition to alter a species's listing status, if it concludes that "[t]he petitioned action is warranted";

- 16 U.S.C. § 1533(b)(5)(A), which provides that, once FWS decides to issue a regulation implementing a determination, the proposed regulation must be published not less than 90 days before the effective date of the regulation;

- 16 U.S.C. § 1533(b)(6)(A), which provides that after publication of a proposed regulation, FWS generally must decide whether to finalize the regulation within one year.

In its second cause of action, Coos County alleged that FWS's failure to publish either a proposed or a final rule delisting the murrelets was, under the APA, "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

FWS filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) (lack of subject-matter jurisdiction) and 12(b)(6) (failure to state a claim upon which relief can be granted). The district court granted the motion, holding that it lacked jurisdiction and, in the alternative, that Coos County had failed to state a claim upon which relief could be granted.

The court reasoned as follows: FWS had made the determination required by 16 U.S.C. § 1533(c)(2), but that determination did not implicate the requirement to "promptly publish" a proposed rule triggered by 16 U.S.C. § 1533(b)(3)(B)(ii). That provision, on its face, applies only when FWS has determined that a *petitioned* action is warranted. As Coos County had not filed a petition, FWS had no duty under either the ESA or the APA promptly to publish a proposed regulation and, so, no duty to publish a final regulation. And, because the citizen suit provisions of those statutes act to waive federal sovereign immunity, and Coos County had not stated a claim under those provisions, immunity was not waived. The district court therefore held that it lacked jurisdiction and dismissed the case without prejudice.

Coos County filed this timely appeal. We essentially agree with the district court and so affirm.

## II. ANALYSIS

### A. Analytic Framework

Before us, as before the district court, Coos County's argument proceeds as follows: (1) once FWS determined in the Five-Year Review that the tri-state murrelets were not a distinct population segment, the agency should have concluded that the species could not be protected under the ESA; (2) the five-year review process is governed by the deadlines normally associated with citizen petitions, including the "promptly publish" obligation of 16 U.S.C. § 1533(b)(3)(B)(ii); and (3) FWS's determination in the Five-Year Review that the tri-state murrelets were not a distinct population segment thus triggered a judicially-enforceable duty promptly to publish a proposed rule delisting the murrelets and then, within a year, a final rule doing so. Coos County so argues even though FWS's ultimate determination in the Five-Year Review was that delisting is *not* warranted.

Coos County's suit, then, is premised on FWS's failure to act upon what Coos County maintains is a statutory duty arising from the distinct population segment determination made in the Five-Year Review. This "failure to act" suit proceeds principally under 16 U.S.C. § 1540(g)(1), the ESA's citizen suit provision. Coos County secondarily relies on an APA provision, 5 U.S.C. § 706(1).

The ESA's citizen suit provision allows for suits in three contexts. Coos County's complaint did not explicitly state which provision it is suing under, but, as it charges that FWS has failed to act, we presume it brings suit under 16 U.S.C. § 1540(g)(1)(C), which allows suits "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under [16 U.S.C. § 1533] which is not discretionary with the Secretary."[7]

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action" is defined to include an agency's "failure to act." 5 U.S.C. § 551(13). Coos County's complaint specifically contends that, under 5 U.S.C. § 706(1), FWS's failure to delist the tri-state murrelets is "agency action unlawfully withheld or unreasonably delayed." Review under that provision is limited to "discrete . . . action[s] that [an agency] is required to take." *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004) (emphases omitted).

---

[7]The other two ESA citizen suit provisions are inapposite. The first, 16 U.S.C. § 1540(g)(1)(A), "is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties — both private entities and Government agencies — but is not an alternative avenue for judicial review of the Secretary's implementation of the statute." *Bennett v. Spear*, 520 U.S. 154, 173 (1997). The second, 16 U.S.C. § 1540(g)(1)(B), concerns suits to "compel" the Secretary to take various species-protective actions, not at issue here.

The scope of 5 U.S.C. § 706(1) tracks that of 16 U.S.C. § 1540(g)(1)(C) for the purposes of this appeal, as the applicability of both provisions depends upon whether FWS has failed to act on a nondiscretionary duty to publish proposed regulations delisting the murrelets (and final regulations thereafter). Importantly, to the extent that the two causes of action are identical, the APA provision is not applicable, because "[i]f a plaintiff can bring suit against the responsible federal agencies under [a citizen suit provision], this action precludes an additional suit under the APA." *Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1005 (9th Cir. 1998) (quotation marks omitted). We consider the impact of *Brem-Air* later in this opinion.

Because "[t]he United States must waive its sovereign immunity before a federal court may adjudicate a claim brought against a federal agency," and has done so through the above-discussed ESA and APA provisions, to "establish waiver of immunity" Coos County must have successfully stated a claim under those provisions. *See Rattlesnake Coal. v. U. S. Envtl. Prot. Agency*, 509 F.3d 1095, 1103 (9th Cir. 2007); *see also U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992); *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998). Thus, if the district court's Rule 12(b)(6) dismissal was justified, its Rule 12(b)(1) ruling was also correct.

In sum, leaving aside for the moment the question whether 5 U.S.C. § 706(1) is available to Coos County on its present complaint, its 16 U.S.C. § 1540(g)(1)(C) and 5 U.S.C. § 706(1) causes of action may proceed only if FWS has a nondiscretionary duty to begin the delisting process — promptly or otherwise — as a result of the determination made in the Five-Year Review and has failed to act upon that duty.

We begin our analysis, therefore, by examining the relationship between the five-year review provision, 16 U.S.C. § 1533(c)(2) and the remainder of 16 U.S.C. § 1533. We then

consider whether, given the determination FWS made in the Five-Year Review, it failed to act upon any duties imposed by 16 U.S.C. § 1533(c)(2). Our "failure to act" inquiry necessarily depends upon the determination FWS made; it does not go behind the determination to inquire whether it should have been made differently.[8]

## B.    The Five-Year Review Provision and the Statutory Context

In Coos County's view, the last sentence of 16 U.S.C. § 1533(c)(2), which provides that "[e]ach [five-year review] determination . . . shall be made in accordance with the provisions of subsections (a) and (b) of [16 U.S.C. § 1533]," incorporates several statutory deadlines in 16 U.S.C. § 1533(b), ordinarily triggered only by the filing of a citizen petition or by FWS's independent decision to publish a proposed rule based upon one of its determinations. *See* 16 U.S.C. §§ 1533(b)(3)(B)(ii), (b)(5)(A), (b)(6)(A). The latter two provisions, 16 U.S.C. §§ 1533(b)(5)(A) and (b)(6)(A) do not contain deadlines governing the period of time between a determination and the publication of a proposed rule, but instead govern the publication process for proposed and final rules.[9] Coos County therefore primarily grounds its contention that FWS has failed to act upon a nondiscretionary duty arising from the five-year review determinations on 16 U.S.C.

---

[8]Coos County argues that its complaint also alleges a violation of a different APA provision, 5 U.S.C. § 706(2)(C), although the complaint nowhere cites that provision and specifically cites 5 U.S.C. § 706(1) instead. Were we to review the Five-Year Review determination under § 706(2)(C), we would inquire whether it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "hold [it] unlawful and set [it] aside" if it is. After addressing the "failure to act" causes of action actually alleged in the complaint we address Coos County's 5 U.S.C. § 706(2)(C) argument, concluding that it is not properly before us. *See infra* note 16.

[9]16 U.S.C. § 1533(b)(5)(A)(i) does, however, require that a proposed regulation be published "not less than 90 days" before its effective date.

§ 1533(b)(3)(B)(ii). That provision, again, imposes a duty on FWS to "promptly publish" a proposed regulation when it determines that an action that it has been petitioned to take is warranted. On its face, the provision applies only when FWS has been petitioned to act. Coos County nonetheless maintains that "the five-year review process substitutes for the interested-party petition process" and so should be governed by the petition process deadline.

We disagree. Contrary to Coos County's view, the "in accordance with" clause of 16 U.S.C. § 1533(c)(2) does not incorporate the deadlines (and corresponding duties) associated with the petition process. To explain why requires us to discuss in some detail the text and context of 16 U.S.C. § 1533; *cf., e.g.*, *K & N Engineering, Inc. v. Bulat*, 510 F.3d 1079, 1081 (9th Cir. 2007) ("Statutory interpretation begins with the plain language of the statute.") (internal quotation marks omitted), as well as the regulations implementing the statute.

## 1. Text and Statutory Structure

Section 4 of the ESA, which is codified at 16 U.S.C. § 1533 (hereinafter § 1533), sets out "two methods . . . for listing species for protection as endangered or threatened," and, likewise, for making other determinations under the ESA concerning those species. *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 834 (9th Cir. 2001). "One method allows the Secretary to act on [his or] her own initiative to identify species for protection [or for regulatory action, generally]. The second allows interested citizens to compel the Secretary's consideration of a species by filing a petition." *Id.* "There are . . . important differences between the two methods that dictate how (and when) the Secretary" must act, however. *Id.* The fundamental flaw in Coos County's statutory argument is that it conflates these two different mechanisms, inappropriately shoe-horning the five-year review process, a statutory step of the kind conducted on the Secretary's initia-

tive, into the system of deadlines created to address citizen-initiated petitions.

### a. The Text of the ESA

### i. Coos County's Interpretation of the "in accordance with" Clause

**[1]** Section 1533(b)(3) is the petition provision from which Coos County draws its "promptly publish" requirement. One point is immediately obvious: The unambiguous text of that provision, quoted below in pertinent part, establishes that it requires a petition to operate:

> (A) To the maximum extent practicable, within 90 days after receiving the *petition* of an interested person under section 553(e) of Title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, the Secretary shall make a finding as to whether the *petition* presents substantial scientific or commercial information indicating that the *petitioned* action may be warranted. If such a *petition* is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

> (B) Within 12 months after receiving a *petition* that is found under subparagraph (A) to present substantial information indicating that the *petitioned* action may be warranted, the Secretary shall make one of the following findings:

> (i) The *petitioned* action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii) The *petitioned* action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

(iii) The *petitioned* action is warranted, but that—

(I) the immediate proposal and timely promulgation of a final regulation implementing the *petitioned* action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) of this section and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

§ 1533(b)(3) (emphases added).

**[2]** The piece of this provision which Coos County primarily seizes upon, § 1533(b)(3)(B)(ii) is, plainly, part of the petition process — indeed, the words "petition" or "petitioned" appear sixteen times in the text of § 1533(b)(3)(B), including in § 1533(b)(3)(B)(ii) itself. Equally plainly, the petition process is explicitly governed by a series of carefully calibrated deadlines. The system of deadlines for the petition process is

demanding and relatively clear: First, "[t]o the maximum extent practicable, within 90 days after receiving the petition of an interested person . . . the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." § 1533(b)(3)(A). The finding shall be "promptly publish[ed]" in the Federal Register, and the Secretary is to "promptly commence" a review if further action is warranted. *Id.* In no circumstances shall this initial ninety-day determination take more than a year. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1176 (9th Cir. 2002). And, within 12 months of receiving the petition, the Secretary must decide whether the petitioned action is warranted, warranted but precluded, or not warranted. §§ 1533(b)(3)(B)(i)-(iii). No matter what FWS determines, its decision is to be "promptly publish[ed] in the Federal Register." *Id.* Critically, "if the petitioned action is warranted," a proposed rule is to be promptly published, "in accordance with [§ 1533(b)(5)]." *Id.* § 1533(b)(3)(B)(ii).

**[3]** In contrast, the five-year review provision does not contain any explicit publication deadlines, although it, like the petition provision, contemplates "a review of the status of the species concerned." *Compare* § 1533(b)(3)(A) *with* § 1533(c)(2). The statute thus sets out two review processes, one with deadlines, one without, and includes deadlines only for the petition process.

**[4]** To the extent that § 1533(b)(3) sets deadlines for petition-initiated actions only, the directive in the five-year review section, § 1533(c)(2), that "[e]ach determination . . . shall be made in accordance with the provisions of [§ 1533(b)]" could not possibly require the application of deadlines that, in the incorporated section, depend on a circumstance not here present, namely, a petition. To require the agency to act according to those deadlines would not mandate the making of the determination "in accordance with" the provisions, as § 1533(c)(2) requires. Instead, it would mandate

the opposite — making the determination *not* in accordance with § 1533(b), by applying deadlines explicitly applicable under § 1533(b) only when there is a citizen petition to a circumstance in which there has been no such petition.

Further, Coos County's theory of the "in accordance with" clause would require courts to embark upon an entirely inappropriate exercise in judicial invention. Section 1533(b)(3)(B) sets out many deadlines for reviews triggered by citizen petitions, some of which have no possible application here. For example, there is no possible reason for requiring FWS to make ninety-day findings concerning its own five-year reviews, nor to publish such tentative conclusions, as it does for petitions. *See* § 1533(b)(3)(A). Coos County does not suggest otherwise. Instead, Coos County would require us to pick and choose among the portions of the petition provision to decide which are applicable to the five-year review provision. We cannot read the "in accordance with" clause as bestowing on the courts such a statutory revision project.

Interpreting the "in accordance with" clause in the five-year review determination as incorporating the petition provisions would also lead to strange results elsewhere in § 1533, where essentially identical language is used. In § 1533(a)(1), for example, the statute provides that "[t]he Secretary shall by regulation promulgated *in accordance with* subsection (b) of this section determine" (emphasis added) whether species are endangered or threatened; and, in § 1533(a)(3)(A), the Secretary is directed to "by regulation promulgated *in accordance with* subsection (b) of this section" (emphasis added) designate critical habitat for endangered and threatened species. Coos County does not argue that these tasks, too, are to be undertaken under the petition deadlines in subsection (b), despite the relevant provisions' use of the same "in accordance with subsection (b)" language present in § 1533(c)(2). Yet, we are offered no principled basis to support treating §§ 1533(a)(1)(A) and (a)(3)(A) differently than the five-year review provision. Far more sensible than supposing that only

one of three "in accordance with" clauses incorporates the petition provision is to conclude that *none* of them do so.

In sum, we find nothing in § 1533(c)(2), or in the ESA generally, to support Coos County's tortured reading of the statute's plain text.

### ii.   The Proper Construction of the "in accordance with" Clause

The text of the statute points to a much simpler, and much more logical, interpretation of the "in accordance with" clause. Most of the provisions of §§ 1533(a) and (b) govern the decisionmaking process in general, not the petition process in particular. Section 1533(c)(2) is naturally read as mandating that "[e]ach [five-year review] determination . . . shall be made in accordance with" those generally applicable provisions. Indeed, if five-year review determinations were *not* made in accordance with those provisions, the ESA's purposes would be quite ill-served.

Among the most important of those provisions is § 1533(a)(1), which sets out the factors to be considered in making a listing decision:

> The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:
>
> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

These factors are of obvious relevance to five-year reviews, which result in determinations about whether a reviewed species's listing should be changed or remain the same.

Also critical to all ESA determinations is § 1533(b)(1)(A), which dictates the information upon which determinations are to be based:

> The Secretary shall make determinations required by subsection (a) (1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

Again, were a five-year review determination not to rely "solely on the basis of the best scientific and commercial data available," it would not be made "in accordance with" the statute. It is provisions like these — which generally direct how determinations regarding listings are to be made and implemented — that § 1533(c)(2) incorporates.

**[5]** In sum, our construction of § 1533(c)(2)'s "in accordance with" clause as incorporating provisions which generally govern determinations, and not the deadlines that pertain only to petitions, is well supported by the text. Coos County's

reading of the statute is, on the other hand, flatly contradicted by the plain language of the ESA.

### b.  Statutory Structure

Coos County's construction of § 1533(c)(2) disregards not only the statutory language but the overall structure of the ESA, which, as we have indicated, reflects a basic distinction between agency-initiated determinations and determinations triggered by citizen petition. "Under the first method [of making determinations], the Secretary may, on [his or] her own accord, consider whether a species is eligible for protection as endangered or threatened." *Ctr. for Biological Diversity*, 254 F.3d at 834. If the Secretary determines that a species is "endangered or threatened," he or she "must publish a proposed rule identifying the species as such." *Id.* at 835 (citing 50 C.F.R. § 424.11 (discussing circumstances in which a species "shall be listed or reclassified")).

**[6]** Importantly, the statute provides no timeline governing the period which begins when the Secretary commences his or her own deliberations and ends with the publication of a proposed rule. Deadlines governing agency-initiated listing decisions appear only in provisions governing the publication process itself. *See* §§ 1533(b)(5)(A), (b)(6)(A). So, while a delay between an agency-initiated determination, including a five-year review determination, and publication of a proposed rule might be so long as to amount to a judicially-enforceable breach of statutory duty, a matter we consider briefly below, there is no fixed deadline for publication.

In practice, the period between the Secretary's first consideration of an action concerning a species and the publication of a proposed rule implementing that action can be quite lengthy. For example, the Secretary may conclude that more research is required before publishing a proposed rule of any kind. Specifically, after considering the relevant factors, he or she may determine that "one of the actions" available with

regard to a species "may be warranted, but that the available evidence is not sufficiently definitive to justify proposing the action at that time." 50 C.F.R. § 424.15(a). If so, the Secretary "may" publish a brief notice so stating in the Federal Register. *Id.* In such cases, species considered candidates for listing may "sit on candidate lists for extraordinarily long periods before becoming the subject of protective rules." *Ctr. for Biological Diversity*, 254 F.3d at 840. Moreover, the Secretary will often assign a low priority to removing a species from the endangered or threatened species list, which is the action that Coos County argues is appropriate here. *See* Endangered and Threatened Species Listing and Recovery Priority Guidelines, 48 Fed. Reg. 43,098, 43,100 (Sept. 21, 1983) ("Priority Guidelines"). So the Secretary enjoys considerable scheduling discretion in the management of listing and research priorities.

After the basic provisions of the ESA as it now exists were enacted in 1973, Congress became aware that such delays could sometimes undermine implementation of the statutory scheme. As a result, "[i]n order to force action on listing and delisting proposals, [it] amended the ESA[ ] . . . to provide certain mandatory deadlines by which the Secretary must act" when presented with a citizen petition. *Ctr. for Biological Diversity*, 254 F.3d at 840 (citations and quotation marks omitted); *see* Endangered Species Act Amendment of 1982, Pub. L. No. 97-304, § 2, 96 Stat. 1411, 1412-14 (1982) (adding the petition process deadlines).[10] The petition process and its deadlines are set out at § 1533(b)(3), which we have quoted and outlined above. This process, which "[e]mbrac[es] citizen participation," *Biodiversity Legal Found.*, 309 F.3d at 1170, is "intended . . . to interrupt the [FWS's] priority system by requiring immediate review." *Id.* at 1177 (quoting *Ctr. for Biological Diversity*, 254 F.3d at 840, alteration and quotation marks omitted). It "replace[s] the Secretary's discretion with

---

[10]In *Center for Biological Diversity*, we wrongly stated that this amendment was made in 1992. *See* 254 F.3d at 840.

mandatory, nondiscretionary duties." *Ctr. for Biological Diversity*, 254 F.3d at 840 (alteration and quotation marks omitted).

Coos County's radical construction of the "in accordance with" clause of the five-year review provision, § 1533(c)(2), would, as we have explained, import at least one of the petition process's deadlines into the agency-initiated five-year review process. It would, as a result, turn the five-year review process into a hybrid of the two, otherwise distinct, decision-making models that the ESA sets out. Moreover, as we have demonstrated, *see supra* Part II(B)(1)(A)(i), applying the petition deadlines to the five-year review process would entail considerable judicial ingenuity, as some of the petition deadlines simply have no sensible application to the five-year review process.

"The petition process strikes a delicate balance between judicial review, agency expertise and the public's right to a healthy, sustainable ecosystem which fosters biological diversity." *Wyoming v. U.S. Dep't of the Interior*, 360 F. Supp. 2d 1214, 1229 (D. Wyo. 2005), *aff'd on other grounds*, 442 F.3d 1262 (10th Cir. 2006). Its "statutory requirements are not mere bureaucratic hoops to jump through, but rather are the stated will of Congress, and the people, and as such should be adhered to with great care." *Id.* at 1245. Importing some — but not all — of the petition process into the agency-initiated process risks upsetting that delicate balance. Our construction, in contrast, maintains the ESA's usual division between agency-initiated determinations and petition-driven actions.

## 2.   Regulations

The ESA's implementing regulations support our view that the last sentence of § 1533(c)(2) is intended only to ensure that five-year review determinations are made consistently with the process provided for agency-initiated determinations in subsections (a) and (b), and with the substantive standards

that apply generally under those subsections to listing-related determinations.

The regulation governing five-year reviews, 50 C.F.R. § 424.21, does not contain any "promptly publish" requirement for proposed rules based upon five-year review determinations. Instead, it requires that "[a] notice announcing those species under active review . . . be published in the Federal Register," but does not mandate publishing five-year review determinations at all, much less developing and publishing rules resulting from them. *Id.*[11]

Moreover, 50 C.F.R. § 424.21 provides, in language echoing the last sentence of § 1533(c)(2), that five-year review determinations "shall be made in accordance with" three regulations which parallel the statutory provisions applying to determinations generally, not the statutory petition process provisions. *See id.* The first of these regulations, 50 C.F.R. § 424.11, tracks §§ 1533(a)(1) and (b)(1)(A): It sets out "[f]actors for listing, delisting, or reclassifying species," discusses when species "shall be listed or reclassified" or "may" be delisted due to these factors, and provides that determinations are to be made on "the basis of the best scientific and commercial data available." The second, 50 C.F.R. § 424.16, like § 1533(b)(5), provides a procedure for publishing proposed rules that applies to both petition-initiated rules and to rules proposed as a result of agency-initiated determinations. Finally, the third regulation, 50 C.F.R. § 424.17, like

---

[11]In full, 50 C.F.R. § 424.21 provides:

> At least once every 5 years, the Secretary shall conduct a review of each listed species to determine whether it should be delisted or reclassified. Each such determination shall be made in accordance with §§ 424.11, 424.16, and 424.17 of this Part, as appropriate. A notice announcing those species under active review will be published in the Federal Register. Notwithstanding this section's provisions, the Secretary may review the status of any species at any time based upon a petition (see § 424.14) or upon other data available to the Service.

§ 1533(b)(6), sets out the deadline for making a decision on a final rule following the publication of a proposed rule.

**[7]** In short, the regulations implementing § 1533(c)(2) fully support the reading we have adopted. The regulations specify how a determination during the five-year review process is to be made and provide guidance on the publication of proposed and final rules arising from that process, without importing any of the deadlines from the petition process into the five-year review determination.

### C.   Coos County's "Failure to Act" Causes of Action

**[8]** Given the construction of § 1533(c)(2) we adopt, Coos County's causes of action challenging FWS's failure to act to delist the tri-state murrelets cannot go forward. As we explained earlier, the ESA and APA provisions under which Coos County filed its complaint require that it be able to allege either, under the ESA, "a failure of the Secretary to perform any act or duty under section 1533 . . . which is not discretionary with the Secretary," 16 U.S.C. § 1540(g)(1)(C), or, under the APA, that FWS has "failed to take a *discrete* agency action that it is *required to take*," *SUWA*, 542 U.S. at 64 (interpreting 5 U.S.C. § 706(1), emphases in original). Coos County cannot meet these requirements.[12]

---

[12]We note, in that regard, that *National Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003), and *Northwest Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136 (9th Cir. 2007), upon which Coos County relies, do not support its position that the Five-Year Review is reviewable, or that the Review's final determination not to delist the tri-state murrelets is improper.

In *National Ass'n of Home Builders*, we reviewed "a final rule listing the Arizona pygmy-owl[ ] as endangered" as a distinct population segment. *Id.* at 839. The National Association of Home Builders contended that the owls were not a distinct population segment and so could not be listed as one. *Id.* at 840. Because FWS had not articulated a rational basis for its designation, we remanded to the district court for further proceedings. *Id.* at 852.

**[9]** Preliminarily, we hold that Coos County's 5 U.S.C. § 706(1) cause of action is precluded because it is identical in all relevant respects to the ESA cause of action, which provides Coos County with an "adequate remedy." *See Brem-Air*, 156 F.3d at 1004-05. In so determining, we acknowledge that "[n]othing in the ESA's citizen-suit provision expressly precludes review under the APA," and that "the causes of action against the Secretary set forth in the ESA's citizen-suit provision are [not] exclusive, [and do not] supplant[ ] those provided by the APA." *Bennett*, 520 U.S. at 175. Here, however, Coos County's APA argument exactly "duplicates the one [it] brought under the [ESA]. Because review of [Coos County's] claim *is* available under the [ESA], it is not subject to review under the APA." *Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001) (emphasis in original); *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) ("Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action.").

The remaining — ESA — cause of action cannot succeed either. As we have demonstrated, the deadlines which the ESA applies to the petition process are not incorporated, *sub silentio*, into the five-year review provision. There can therefore be no violation of § 1533(b)(3)(B)(ii)'s "promptly pub-

Similarly, *Northwest Ecosystem Alliance* held only that the DPS Policy itself was a reasonable construction of the ESA, 475 F.3d at 1145, and that FWS's denial of a petition to list a population of squirrels as a distinct population segment was not arbitrary and capricious. *Id.* at 1150.

*National Ass'n of Home Builders* and *Northwest Ecosystem Alliance* establish that we may review a final rule listing a distinct population segment under the DPS Policy, and that we may also review FWS's denial of a petition to list a population under the Policy. They did not consider whether a five-year review determination imposes nondiscretionary duties on FWS promptly to publish a proposed rule, nor whether a population that occupies a significant portion of a species' range may be listed even if it is not a distinct population segment. As such, they bear only a tangential connection to the questions in this case.

lish" requirement based upon the determination made in the Five-Year Review.[13]

We need not determine whether we nonetheless retain authority to compel FWS to publish at some point a proposed regulation based upon a five-year review determination to change a species's listing, *cf. Forest Guardians v. Babbitt*, 164 F.3d 1261, 1270-73 (10th Cir. 1998), because FWS here determined that the tri-state murrelets' listing status should *not* be changed. *See* Five-Year Review at 21, 28.

The ESA and APA provisions under which Coos County brought suit allow challenges to FWS's alleged failure to act, not to the substantive content of its actions. This principle is entirely clear in the 5 U.S.C. § 706(1) context and, as § 1540(g)(1)(C) likewise concerns failures to act, it is necessarily also so limited. *See, e.g.*, *Bennett*, 520 U.S. at 171-72 (explaining that § 1540(g)(1)(C) may be used to challenge "the omission of . . . required procedures"); *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 728 (9th Cir. 2004) ("[Section] 706(1) generally only allows the district court to compel an agency to take action, rather than compel a certain result, when action is unlawfully withheld."). So, in considering whether FWS has fulfilled any duties arising from its determination, we must look to the determination FWS actually made.

FWS determined that delisting the tri-state murrelets was not warranted because the interim delisting criteria in the Recovery Plan had not been met and "[t]he threat situation

---

[13]At argument, counsel for Coos County posited that deadlines might alternatively be found in § 1533(c)(1), which provides that "[t]he Secretary shall from time to time revise each list . . . to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section." That provision requires FWS only to revise the list "from time to time," to reflect "recent determinations"; it does not create a duty promptly to publish a proposed or final rule based upon a five-year review determination.

has not changed" in a way that would alleviate the threat to the species. Five-Year Review at 17-18, 21. It concluded that a "range-wide status review" was the next appropriate step. *Id.* at 28. In effect, FWS concluded that "the available evidence is not sufficiently definitive to justify proposing" any changes to the murrelets' status at this time, *see* 50 C.F.R. § 424.15, and that what information it did have showed that the threats to the species continued. Also, in connection with the distinct population segment issue that so concerns Coos County, FWS explained that "a court found that, as the murrelet qualifies for listing throughout a significant portion of its range, 'there is no need to consider the alternative basis of whether the tri-state population is a distinct population segment.' " Five-Year Review at 6 (quoting *Marbled Murrelet*, No. C91-522R at 12). So, FWS gave reasons for continuing the listing, entirely independent of its distinct population segment determination.[14] No duty to delist can possibly arise from FWS's determination that delisting was not warranted.[15]

---

[14]Coos County did allege in its complaint that FWS "determined . . . the tri-state murrelets . . . should be removed from the list of endangered and threatened wildlife." But the Review was attached to the complaint, and it simply does not say what Coos County alleged; it says the opposite. "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see also Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007) ("When ruling on a motion to dismiss, we may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice.") (internal quotation marks omitted).

[15]Coos County suggests, in an aside, that the Five-Year Review violates 16 U.S.C. § 1533(b)(1)(A), which provides in pertinent part that "[t]he Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him." Because the last sentence of 16 U.S.C. § 1533(c)(2) incorporates this provision, as we have explained, FWS does have such a duty when making its five-year review determinations. *See Bennett*, 520 U.S. at 172 (FWS has no "discretion to ignore the required procedures of decisionmaking"). Save for expressing its disagreement with FWS's conclusions, however, Coos County does not explain how this provision was

FWS thus also has not failed to act upon any duty to publish a proposed delisting rule in accordance with § 1533(b)(5), or to publish a final rule in accordance with § 1533(b)(6).

**[10]** In short, Coos County has not alleged a failure to perform a nondiscretionary act or duty imposed by § 1533, whether premised on the petition process deadlines or on the agency's more general duty to act on its own determinations. It has therefore failed to state a claim on its "failure to act" causes of action.[16]

---

violated. *Cf. United States v. Kimble*, 107 F.3d 712, 715 n.2 (9th Cir. 1997) (holding that an "argument [that] was not coherently developed in [the] briefs on appeal" was abandoned). Moreover, this allegation cannot be found in the complaint, even under the notice pleading standard, *see* Fed. R. Civ. P. 8(a), (e), so the district court properly did not consider it.

[16]As noted earlier, *supra* note 8, Coos County maintains that its complaint also contained a 5 U.S.C. § 706(2)(C) argument, challenging FWS's decision to maintain the tri-state murrelet listing as "in excess of [the agency's] statutory jurisdiction." A violation of this specific provision was not alleged in the complaint, and the district court did not rule upon it. Nonetheless, "[n]otice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories," *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (emphasis in original), and the complaint, fairly read, did allege that FWS was acting without legal authority.

But Coos County only mentions a distinct § 706(2)(C) argument fleetingly in its opening brief, and does so by ignoring entirely the "significant portion of the range" rationale that led to the original listing. *See Ghahremani v. Gonzales*, 498 F.3d 993, 997 (9th Cir. 2007) (holding such a sketchily-made argument abandoned); *cf. Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001) (citing the tri-state murrelet listing as an example of a species properly listed in a significant portion of its range). Coos County finally fleshes out its position in its reply brief, making clear that it is really arguing that the Listing Rule's "significant portion of the range" rationale for protecting the tri-state murrelets, which is independent of the "distinct population segment" rationale, is a "[m]ere unsupported assertion[ ]." In its view, FWS "provided absolutely no evidence" to support the "significant portion of the range" finding in the original Proposed Rule, lacked authority to list the population on that ground in the

## III.   CONCLUSION

**[11]** We hold that the dismissal of Coos County's complaint was entirely proper.

Coos County, however, is not without recourse. It may file a delisting petition. As the District Court for the District of Columbia put it while granting summary judgment to the government in *American Forest Research Council v. Hall*, 533 F. Supp. 2d 84, 93 (D.D.C. 2008), an action brought by other parties challenging the tri-state murrelet Five-Year Review on grounds very similar to those in this case: "[I]f [Coos County] believes that the threatened listing of the tri-state population causes [the County] unwarranted injury, [it] has the right and the ability to petition FWS to delist the tri-state population of the marbled murrelet. . . . But [Coos County] has failed to pursue this course of action." 533 F. Supp. 2d at 93.

Coos County maintains that FWS has already drawn conclusions in a five-year review, so that it would be futile now to file a petition. That argument relies on Coos County's erroneous belief that the five-year review and petition processes substitute for each other. They do not.

first place, and so could not continue the listing after the Five-Year Review.

"The general rule is that appellants cannot raise a new issue for the first time in their reply briefs." *Ghahremani*, 498 F.3d at 997 n.3 (internal quotation marks omitted). We decline to consider Coos County's last-minute arguments, which have never been fully briefed or argued before us or the district court. Besides, the statute of limitations for such a challenge to the original Listing Rule expired long ago. Whatever effect the original Listing Rule has on Coos County began with the Rule's publication in 1992, and has not been altered by the Five-Year Review. *Cf. Wind River Mining Corp. v. United States*, 946 F.2d 710, 713, 715 (9th Cir. 1991) (holding that the six-year statute of limitations set out by 28 U.S.C. § 2401(a) applies, with restrictions not relevant here, to APA challenges to allegedly *ultra vires* agency decisions).

The Five-Year Review here functioned as it was supposed to: It provided useful information that prompted FWS to consider broadening protections for the murrelets, and to consider revising aspects of its current listing. It also provided information to Coos County and other interested members of the public, including parties who may decide, based on the information provided in the Five-Year Review, to file a delisting petition. To separate this process from the petition process makes perfect sense.

Nor would such a petition be futile. FWS's conclusions in five-year reviews are not set in stone. Rather, five-year reviews provide useful guidance on the rationales and data presently supporting an ESA listing, point up remaining uncertainties, and allow petitioners to marshal arguments and information that the agency may find germane in light of the review. The extensive public process triggered by the filing of a petition may well change the agency's mind. For instance, in this case FWS indicated that it would find more information on the range-wide health of the murrelets helpful in deciding on a future course of action. True, a petition still may not succeed, but the fact that some petitions will lack merit does not mean that five-year reviews render petitions futile as a general matter, or in this case.

In sum, our view of Coos County's suit resembles that of the court in *Wyoming v. U.S. Dep't of the Interior*, which also considered an attempt to avoid the petition process through an effort to establish a "mandatory duty to delist" by other means. *See* 360 F. Supp. 2d at 1231-33, 1244-45. We are "at a loss to explain the actions of [Coos County]." *Id.* at 1245. It could easily have filed a delisting petition — years ago. "This action, if it had been taken, would have forced the Federal Defendants to make choices under hard deadlines set by Congress . . . . and much of the Federal Defendants' arguments presented here would have melted away, allowing this Court to reach the merits of many of [Coos County's] claims." *Id.*

If Coos County wishes to force FWS to act swiftly on delisting the tri-state murrelets, the petition process is open to it.

**AFFIRMED.**